UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| GEGE MONTON MATTHEWS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 5:17-cv-02195-ACA-JHE |
| ) | |
| HUNTSVILLE CITY POLICE ) | |
| DEPARTMENT, et al., ) | |
| ) | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff George Monton Matthews sued Defendant Matthew Saltzman, a police officer with the City of Huntsville, Alabama, alleging that Mr. Saltzman's use of his police dog during Mr. Matthews' arrest constituted excessive force, in violation of the Fourth Amendment to the Constitution. (Doc. 17 at 2, 5). A magistrate judge prepared a report and recommendation, in which he recommended that the court grant Mr. Saltzman's motion for summary judgment. (Doc. 74). Mr. Matthews objects to the magistrate judge's description of the facts as well as his legal conclusions. (Doc. 75).

The court **SUSTAINS IN PART** and **OVERRULES IN PART** Mr. Matthews' objections. The court **SUSTAINS** some of Mr. Matthews' objections to the magistrate judge's factual findings. Instead of going through those

factual objections one by one, the court will instead describe the facts based on the court's *de novo* review of the record.  But the court **OVERRULES** the objections to the magistrate judge's conclusions of law.  Because Mr. Saltzman is entitled to qualified immunity from this lawsuit, the court **GRANTS** the motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Saltzman and against Mr. Matthews.

## I. BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).  In this case, the parties submitted both testimony and video evidence relating to Mr. Matthews' arrest by Mr. Saltzman.  Where the video evidence "blatantly contradict[s]" testimonial evidence, "so that no reasonable jury could believe" the testimonial evidence, the court must view "the facts in the light depicted by the video tape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Late morning on August 8, 2017, multiple Huntsville City police officers, including Mr. Saltzman, heard a report of a stolen white Chevy Equinox. (Docs. 30-1 at 3 ¶ 5; 30-2 at 2–3 ¶ 3; 30-3 at 2–3 ¶ 3).  Mr. Saltzman is a K9 officer paired with K9 Ronin. (Doc. 30-1 at 2–3 ¶ 3).  Mr. Saltzman had been working with Ronin for about six months at the time of this incident.  (*Id.* at 3 ¶ 3).  Ronin had never

previously bitten a suspect because every other suspect up until that point had surrendered. (Doc. 71-1 at 19–20).

When Mr. Saltzman located a white Equinox, the driver of the Equinox—later identified as Mr. Matthews—fled in the car. (Doc. 30-1 at 3–5 ¶¶ 5–6). Mr. Saltzman and several other officers followed in a high speed chase until Mr. Matthews crashed the car in a residential neighborhood and continued to flee on foot. (*Id.* at 3–4 ¶ 5; Doc. 30-2 at 2–4 ¶¶ 3–4).

Mr. Saltzman and Ronin continued the pursuit on foot, with Mr. Saltzman loudly yelling "stop running or I'll send the dog" and "here" as he approached a chain-link fence that he had seen Mr. Matthews jump over. (Doc. 30-1 at 4–5 ¶ 6; Saltzman at 01:00–01:12). Although Mr. Matthews heard Mr. Saltzman yelling, he did not understand the words Mr. Saltzman yelled or that a police dog was involved in the chase. (Doc. 49-3 at 1 ¶ 2).

As Mr. Saltzman approached the fence, which was located behind someone's house, another officer, Charles Draper, came around the other side of the house, and Ronin ran at Mr. Draper and bit the front of his uniform. (Saltzman at 01:12–01:18; Draper at 2:47–2:51; Doc. 30-3 at 4 ¶ 5). Mr. Saltzman ran toward Mr. Draper and Ronin, calling "no" and "out"—the verbal command for Ronin to release—repeatedly. (Saltzman 01:18–01:56; Draper at 2:53–2:58; *see also* Doc. 71-1 at 33). But Ronin did not release in response to the verbal command, requiring

Mr. Saltzman to use a physical release. (Saltzman 01:18–01:56; Draper at 2:58–3:33). The physical release involves taking Ronin's choke collar and twisting while lifting up, to restrict the dog's air flow. (*See* Doc. 71-1 at 32). The parties refer to this as "choking Ronin off."

Ronin did not immediately release Mr. Draper while Mr. Saltzman was attempting to verbally and physically release him. (*See* Saltzman at 01:18–01:56). Ronin maintained his bite for 38 seconds as Mr. Saltzman repeatedly gave the verbal release command and choked him off. (*Id.*). After getting Ronin off Mr. Draper, Mr. Saltzman put him on a leash and returned to the search for Mr. Matthews. (*Id.* at 02:05–09:55).

During that search, officer Weston Davis found Mr. Matthews hiding under a car in someone's backyard. (Doc. 30-1 at 5–6 ¶ 8; Doc. 30-3 at 4–5 ¶ 7). When Mr. Saltzman and Ronin approached Mr. Davis, Ronin bit him in the crotch. (*Id.* at 09:53–10:17). Again, Mr. Saltzman repeatedly used the verbal and physical commands to get Ronin to release, but Ronin held on until Mr. Saltzman choked him off. (*Id.*). This time it took about 24 seconds to get Ronin to release his bite. (*See id.*).

Immediately after getting Ronin to release Mr. Davis, Mr. Saltzman yelled to Mr. Matthews to "come out to me now, dude." (Saltzman at 10:17–10:19). But he

4

did not repeat his warning that he had a police dog, and Mr. Matthews did not realize that a police dog was involved.[1] (*See id.* at 10:17–10:48; Doc. 49-3 at 1 ¶ 2).

Mr. Saltzman lifted Ronin over the fence separating the street from the yard and then climbed over the fence himself. (Saltzman at 10:19–10:37). Mr. Saltzman testified that he could see Mr. Matthews under the car, and that Mr. Matthews was reaching toward his pocket, causing Mr. Saltzman to fear that Mr. Matthews might have a weapon. (Doc. 30-1 at 6 ¶ 9). However, the video does not confirm this account, and Mr. Matthews attested that he never reached toward his pocket. (Doc. 49-3 at 1 ¶ 3). At this stage in the proceedings, the court must accept Mr. Matthews' version of events, and concludes that a reasonable jury could find that Mr. Saltzman did not see Mr. Matthews reach toward his pocket while he was hiding under the car.[2]

---

[1] After Mr. Weston located Mr. Matthews hiding under a car, Mr. Draper ran back toward Mr. Saltzman and Ronin. (Draper at 11:12–11:19). As he ran, he yelled "dog coming, dog coming" to alert the other officers about proximity. (*Id.* at 11:20–11:23; Doc. 30-3 at ¶ 7). Mr. Matthews did not hear this warning. (*See* Doc. 49-3 at 1 ¶ 2).

[2] Mr. Matthews argues that the court must infer that Mr. Saltzman knew he had no weapon because Mr. Saltzman testified that "he would not use his dog if a weapon was likely present." (Doc. 75 at 10). This is a misrepresentation of Mr. Saltzman's testimony. Mr. Saltzman actually testified that he would not use a police dog if he knew that the suspect was armed, but mere suspicion that the suspect was armed would not stop him from using the dog because in most situations, a suspect might be armed. (Doc. 71-1 at 32). Even making all inferences in Mr. Matthews' favor, the fact that Mr. Saltzman continued to use Ronin does not establish that Mr. Saltzman believed Mr. Matthews to be unarmed.

Mr. Saltzman directed Ronin to the car under which Mr. Matthews was hiding and ordered him to "get him." (Saltzman at 10:37–10:48). Mr. Saltzman repeatedly ordered Mr. Matthews to show his hands and to come out from under the car as Ronin bit Mr. Matthews' left shoulder and began pulling him out. (*Id.* 10:48–11:24). After Ronin bit him, Mr. Matthews said "okay" and repeatedly stated, "I'm coming out." (*Id.* at 10:53–11:20).

After Mr. Matthews had been pulled out from under the car, Mr. Saltzman held Ronin by the choke collar as another officer handcuffed Mr. Matthews. (Saltzman at 11:20–11:53). Ronin maintained his bite on Mr. Matthews for a total of, at most, one minute and three seconds. (*See id.* at 10:50–11:53). Because Mr. Saltzman never gave the verbal command to release, it is unclear when Mr. Saltzman began his attempt to make Ronin end the bite. But one second after Mr. Matthews was handcuffed, Mr. Saltzman grabbed Ronin by the collar in the same position he had used to choke Ronin off Mr. Draper and Mr. Davis. (Draper at 13:05–13:10; Saltzman at 11:20–11:30). Counting from the moment Mr. Saltzman grabbed Ronin's collar in the position to perform a physical release, it took Ronin 24 seconds to release his bite. (Saltzman at 11:28–11:52). In other words, Ronin kept his bite on Mr. Matthews for 25 seconds after Mr. Matthews had been handcuffed. (*See* Saltzman at 11:20–11:53; Draper at 13:05–13:30).

6

Mr. Matthews ultimately required stitches to treat the dog bite. (Doc. 30-2 at 11–12 ¶ 21; Doc. 49-3 at 1–2 ¶ 4).

## II. DISCUSSION

The only claim asserted against Mr. Saltzman is for use of excessive force, in violation of the Fourth Amendment. (Doc. 17 at 5; *see also* Docs. 72, 75 (arguing only excessive force)). The magistrate judge recommended granting summary judgment in Mr. Saltzman's favor on the basis that Mr. Matthews had not created a genuine dispute of material fact about whether Mr. Saltzman violated Mr. Matthews' constitutional rights, and alternatively on the basis that Mr. Saltzman was entitled to qualified immunity. (Doc. 74 at 8–15). Specifically, the magistrate judge found that the use of force was objectively reasonable in the circumstances, that Mr. Saltzman did not use deadly force, that Mr. Saltzman was not required to warn Mr. Matthews that he was about to sic Ronin on him, that no evidence establishes that Ronin bit Mr. Matthews after Mr. Matthews was handcuffed, and that in any event, this use of force was not clearly established as excessive. (*Id.*).

Mr. Matthews objects, arguing that the use of force was objectively unreasonable because Mr. Saltzman failed to issue any warnings about his use of deadly force, he knew that Ronin would not release on verbal command, and he allowed Ronin to continue biting Mr. Matthews for too long. (Doc. 75). The court **OVERRULES** these objections.

Mr. Saltzman has asserted the defense of qualified immunity. (Doc. 30 at 38). "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation marks omitted). A defendant seeking the protection of qualified immunity must first show that "he was acting within the scope of his or her discretionary authority when the challenged action occurred." *Patel v. City of Madison*, 959 F.3d 1330, 1338 (11th Cir. 2020). The parties here agree that Mr. Saltzman was acting within the scope of his discretionary authority.

The burden therefore shifts to the plaintiff to establish that the defendant violated a constitutional right, and that the "right was clearly established in light of the specific context of the case, not as a broad general proposition . . . so as to have provided fair notice to [the defendant] that his actions violated [the plaintiff]'s rights." *Patel*, 959 F.3d at 1338 (alterations and quotation marks omitted). "Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose." *Singletary v. Vargas*, 804 F.3d 1174, 1184 (11th Cir. 2015). In rare cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question

8

has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (alteration and quotation marks omitted).

The claim at issue in this case is one of excessive force in the context of an arrest. That type of claim arises under the Fourth Amendment. *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1333 (11th Cir. 2004). To prevail at summary judgment on a Fourth Amendment excessive force claim, the court must determine "whether, under the plaintiff's version of the facts, the officer behaved reasonably in the light of the circumstances before him." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (alterations and quotation marks omitted). Although the court must use the plaintiff's version of events, the determination of reasonableness depends on the perspective of a reasonable officer at the scene, without the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Eleventh Circuit has instructed courts to look at the following factors in determining the reasonableness of an officer's use of force: (1) the severity of the crime; (2) whether the individual posed an immediate threat to officers or others; (3) whether the individual actively resisted or attempted to evade arrest; (4) the need to use force; (5) the amount of force used in light of the need; and (6) the severity of the injury. *Patel*, 959 F.3d at 1339. The court must be "mindful that officers make split-second decisions in tough and tense situations." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013).

An analysis of whether a constitutional violation occurred is unnecessary in this case because Mr. Matthews has not shown that the right he asserts was clearly established under the circumstances present here.³ *See Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013) (stating that courts have "the flexibility to determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all"). The Eleventh Circuit has addressed the use of police dogs on multiple occasions. *See Jones v. Fransen*, 857 F.3d 843, 848 (11th Cir. 2017); *Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009); *Priester v. City of Riveria Beach*, 208 F.3d 919 (11th Cir. 2000). These cases provide the general contours of when a police dog's bite constitutes excessive force, so the court will address each of them.

In *Priester*, a K9 officer was searching for a burglary suspect who had taken about $20 worth of snacks from a shop, when he came upon the plaintiff in the woods. 208 F.3d at 923, 927. The plaintiff stood with his hands in the air and laid on the ground when the police officer commanded him to do so. *Id.* at 923. Despite the plaintiff's compliance, the police officer ordered his dog to attack the plaintiff, pulled his gun and threatened to kill the plaintiff, and watched as the dog repeatedly

---

³ The court's decision to determine qualified immunity on the clearly-established prong in no way implies that a constitutional violation occurred.

10

bit the plaintiff's legs for as long as two minutes, causing fourteen puncture wounds. *Id.* at 923–24. The Eleventh Circuit held that the police officer's actions constituted excessive force under clearly established law. *Id.* at 927.

In *Crenshaw*, police officers were pursuing the plaintiff, who was suspected of committing two armed robberies, when he crashed his car into a patrol car and fled into the woods. 556 F.3d at 1285. The K9 officer tracking him did not issue any canine warnings. *Id.* At some point, the plaintiff laid on the ground and yelled about his intent to surrender, but the police dog nevertheless attacked him. *Id.* at 1285–86, 1291. Although the plaintiff offered no resistance, the K9 officer did not call off the dog until after he had handcuffed the plaintiff. *Id.* at 1291. The dog bit the plaintiff 31 times. *Id.* at 1286.

The Eleventh Circuit held that the K9 officer was entitled to qualified immunity because the use of force was not excessive: the plaintiff was suspected of committing a serious crime, actively fled from the police, and attempted to hide in the woods. *Crenshaw*, 556 F.3d at 1292. The Eleventh Circuit noted that the officer reasonably believed the suspect was armed and, in light of his previous attempts to flee, reasonably questioned the sincerity of the plaintiff's attempt to surrender. *Id.* at 1292–93. The Eleventh Circuit noted in dicta that "it would have been objectively unreasonable for [the officer] to allow the canine to continue attacking [the plaintiff] after he was secured." *Id.* at 1293.

11

In *Edwards*, police officers pulled the plaintiff over after he ran a stop sign. 666 F.3d at 1292–93. After the plaintiff pulled his car over, he got out and ran into the woods and laid down. *Id.* at 1293. Police officers called out canine warnings but the plaintiff did not hear or respond to those warnings. *Id.* When the police dog tracked the plaintiff down, the police ordered the plaintiff to show his hands, which were already outstretched and visible. *Id.* The plaintiff indicated that he surrendered, but the dog still ran at him and bit him on the leg. *Id.* The officers allowed the dog to repeatedly bite him on the leg for five to seven minutes even as the plaintiff begged to surrender. *Id.* They finally handcuffed him and removed the dog using a verbal command. *Id.*

The Eleventh Circuit held that the officers were entitled to qualified immunity for the decision to use a dog to track and "initially subdue" the plaintiff." *Edwards*, 666 F.3d at 1295. The Court noted that the plaintiff had fled after committing a non-serious traffic offense, and a reasonable officer would not have known what level of danger the plaintiff posed. *Id.* Moreover, the plaintiff did not attempt to surrender until after the dog bit him. *Id.* The Court stated: "this is the sort of 'split-second' determination made by an officer on the scene that *Graham* counsels against second guessing. In accord with that guidance, we defer to [the officer]'s judgment that it was appropriate to employ extraordinary but non-deadly force in this instance." *Id.* (citation omitted). However, the court denied qualified immunity from the claim

that the officer used excessive force in allowing the dog to continue biting the plaintiff for five to seven minutes because although the police had reasonably believed that the plaintiff posed a danger, the plaintiff had "mitigated" that danger by laying with his hands out and begging to surrender. *Id.* at 1295–96. In light of those facts, the continuing dog attack became a gratuitous and excessive use of force. *Id.* at 1296.

Most recently, in *Jones v. Fransen*, the plaintiff alleged that police responded to a report that he had committed a home burglary. 857 F.3d at 848. A K9 officer and his dog, believing the plaintiff had fled into a ravine, issued a canine warning and entered the ravine. *Id.* The K9 officer released his dog before spotting the plaintiff laying motionless on the ground. *Id.* The dog "savagely attack[ed] and t[ore]" at the arm of the unresisting plaintiff, causing permanent damage to his arm. *Id.* (alterations in original). The Eleventh Circuit concluded that the officer was entitled to qualified immunity *Id.* at 854–55. Because the facts in *Jones* were somewhere between those presented by *Priester* and *Crenshaw*, no caselaw clearly established that the officer's actions were a constitutional violation. *Id.* at 855. Nor was the conduct so obviously unconstitutional that any reasonable officer would have known his actions were unconstitutional. *Id.* at 855.

Against that backdrop, the court easily concludes that Mr. Matthews has not shown the existence of a clearly established right in this context. Viewed from the

13

perspective of a reasonable officer on the scene, Mr. Matthews was suspected of stealing a car and had just led police on a high speed chase through a residential neighborhood, crashed his car, and continued to flee on foot through that neighborhood before hiding underneath a car in someone's backyard. A reasonable officer would know that Mr. Matthews had already disregarded orders to stop and had not responded to orders to come out from under the car. And a reasonable officer in that position would have no way of knowing whether Mr. Matthews was armed or if he would slip out from under the car and continue his flight.

This case is materially distinguishable from the *Priester* case, which is the only one of the four cases described above that found a clearly established right. In *Priester*, the crime was minor—the theft of $20 worth of snacks. 208 F.3d at 923, 927. Here, the crimes were serious—the theft of a car and leading the police on a reckless car chase through a residential neighborhood. In *Priester*, the plaintiff was visible to the officer and followed all of his commands without question. *Id.* at 923. Here, Mr. Matthews fled from the police in manner that risked not only the police chasing him but also the people in the neighborhood, then hid under a car located in someone's backyard, disregarding the officer's commands to come out from underneath it. In *Priester*, the officer ordered his dog to attack and allowed the attack to continue for two minutes without interfering. *Id.* at 927. Here, Ronin bit once and held on, and the bite lasted for slightly over one minute. Moreover,

Mr. Saltzman grabbed hold of Ronin within one second of Mr. Matthews being handcuffed, and ended the bite 24 seconds later.[4]

On the other hand, this case is, in many ways, materially similar *Crenshaw* and *Jones*, where the Eleventh Circuit found qualified immunity appropriate. As in *Crenshaw*, Mr. Matthews was suspected of serious crimes and had already risked the safety of officers and the public. 556 F.3d at 1285. In some ways, this case is materially different in a way that convinces the court more strongly that the asserted right was not clearly established. For example, in *Crenshaw*, the plaintiff attempted to surrender *before* the police dog bit him, an action that Mr. Matthews did not take until *after* Ronin had bitten him and started dragging him out from under the car. *See id.* at 1285–86, 1291. And in *Crenshaw*, the dog bit the plaintiff 31 times, whereas here, Ronin bit Mr. Matthews once and held on. *Id.* at 1286.

Finally, the *Edwards* decision demonstrates that the asserted right was not clearly established. In *Edwards*, as in this case, the police officers did not know that the suspect was armed but reasonably believed he posed a danger based on his

---

[4] Mr. Matthews argues that because he became complant the moment Ronin bit him, any use of force after that moment is constitutionally excessive. (Doc. 75 at 8–9). The court categorically rejects the inference that Mr. Matthews ceased to pose a threat the moment Ronin bit him. Mr. Matthews had certainly shown his intent to escape from the police, and Mr. Saltzman had no reason to believe that Mr. Matthews would not again attempt to flee if Ronin released him before Mr. Matthews was secured by handcuffs and in the presence of other officers. *See Graham*, 490 U.S. at 396 (holding that the court must evaluated the reasonableness of an officer's actions from the perspective of a reasonable officer at the scene, without the benefit of hindsight).

behavior when confronted by the police, and his failure to surrender until after the dog bit him. *See* 666 F.3d at 1295. That similarly supports a finding that the right was not clearly established. A difference between this case and *Edwards* also supports that finding. The prolonged attack in *Edwards* lasted five to seven minutes after the suspect had been subdued and was begging to surrender, but the bite in this case lasted at most, slightly over one minute (of which Mr. Matthews was handcuffed for less than thirty seconds). *See id.* at 1295–96.

Based on the court's survey of Eleventh Circuit caselaw, the court is convinced that no clearly established law prohibited Mr. Saltzman's actions. Mr. Matthews argues that dicta from *Crenshaw* clearly establishes the right asserted in this case because Mr. Saltzman allowed Ronin to hold the bite for too long. (Doc. 75 at 15–16).

In *Crenshaw*, the Court stated that "it would have been objectively unreasonable for [the officer] to allow the canine to continue attacking [the plaintiff] after he was secured." 556 F.3d at 1293. This argument fails for two reasons: first, "the law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Santamorena v. Georgia Military Coll.*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998). Second, even if that statement from *Crenshaw* was a holding, it is a "broad general proposition" that would not "have provided fair notice to [the defendant] that his actions violated [the

16

plaintiff]'s rights." *Patel*, 959 F.3d at 1338 (alterations and quotation marks omitted). And as discussed above, the only case to have found a clearly established right in this case context is materially distinguishable.

Mr. Matthews also argues that *Crenshaw* clearly establishes that a K9 officer must give a canine warning if doing so is safe. (Doc. 75 at 9–10, 14). As an initial matter, the bodycam footage from Mr. Saltzman establishes beyond a doubt that he called out a canine warning as soon as he began the foot chase. But to the extent Mr. Matthews contends that Mr. Saltzman had to give another warning once Mr. Matthews had been discovered hiding under the car, he does not provide any caselaw holding that such a warning is required.

Indeed, Mr. Matthews states that "[n]o Eleventh Circuit canine case, published or unpublished, of which the undersigned is aware (and the undersigned believes he has reviewed every one of them), has authorized a canine use of force without either a warning (i.e., *Jones*) or a good reason for not giving one (i.e., *Crenshaw*)." (Doc. 75 at 16). The fact that no case has authorized a practice does not mean that the practice is unauthorized. Without a decision from the U.S. Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court, the need to give a canine warning is not clearly established. *Singletary*, 804 F.3d at 1184. Nor is the need to give a canine warning so obviously required that caselaw is unnecessary.

Mr. Matthews argues that because a police dog is deadly force, *Tennessee v. Garner*, 471 U.S. 1 (1985) requires the K9 officer to give a warning if feasible. (Doc. 75 at 17–18). Again, putting aside the fact that Mr. Saltzman gave a canine warning early in the chase, the Eleventh Circuit has held that a police dog used in circumstances similar to the ones present here is not a use of deadly force. *See Edwards*, 666 F.3d at 1295 (finding that the use of a police dog to track and apprehend a suspect was "extraordinary but non-deadly force").

Finally, Mr. Matthews argues that the use of force in this case was so clearly excessive that no caselaw is necessary because any reasonable officer would know that using a dog that does not release immediately on command is a constitutional violation. (Doc. 75 at 4–8). The evidence does show that Ronin would not immediately release his bite: in all three bites that occurred during the pursuit of Mr. Matthews, Ronin held on for twenty to thirty seconds after Mr. Saltzman gave a release command. But the court cannot conclude that a twenty to thirty second delay in releasing a bite is so obviously unconstitutional that no caselaw is needed to hold a police officer liable in these circumstances.

Mr. Matthews' other objections to the report and recommendation center around the finding that the use of force was constitutionally permissible. (*See* Doc. 75 at 11–14). Because the court has found qualified immunity appropriate on the

clearly-established prong, the court need not address those objections. The court **OVERRULES** Mr. Matthews' objections to the grant of summary to Mr. Saltzman.

### III. CONCLUSION

The court **SUSTAINS** Mr. Matthews' objections to some of the facts described by the magistrate, but **OVERRULES** all other objections. The court has modified the report as set out above, but **ACCEPTS** the recommendation to grant summary judgment to Mr. Saltzman. Because Mr. Saltzman is entitled to qualified immunity, the court **WILL ENTER SUMMARY JUDGMENT** in his favor and against Mr. Matthews on the excessive force claim.

The court will enter a separate final judgment.

**DONE** and **ORDERED** this August 11, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE